*92 OPINION OF THE COURT
Eileen Bransten, J.
In the interests of efficiency and judicial economy, the following proceedings are consolidated for purposes of disposition and are addressed in this decision and judgment: Amato v Refco, LLC (Index No. 604195/01), Blumenfeld v Refco, LLC (Index No. 604194/01), Bushnell v Refco, LLC (Index No. 604197/01), Crosby v Refco, LLC (Index No. 604198/01), Dieckhaus v Refco, LLC (Index No. 604191/01), Dominguez v Refco, LLC (Index No. 604188/01), Elliott v Refco, LLC (Index No. 604206/01), Herst Ventures v Refco, LLC (Index No. 604196/ 01), Imhof v Refco, LLC (Index No. 604190/01), Engel v Refco, LLC (Index No. 604187/01), Krickl v Refco, LLC (Index No. 604189/01), Rosett v Refco, LLC (Index No. 604192/01), and XBD Claims Mgt. Co. v Refco, LLC (Index No. 604193/01). (See, Sept. 26, 2001 consolidation stipulation, affidavit of Ryan P. Farley, exhibit A.)
Petitioners Frank and Regina Amato, Dr. Michael and Linda Blumenfeld, David P. Bushnell and David P. Bushnell Trust, Leonard Andrew Crosby and the Crosby Family Trust, Robert L. Dieckhaus, trustee for the Robert L. Dieckhaus Revocable Living Trust, William David Dominguez, individually and as successor to CVD Communications, Inc. (formerly known as Saunders Communications, Inc.), Robert Elliott, Herst Ventures, Inc. (formerly known as Peerless Lighting Corporation), Hans Imhof, Jack Engel and Irene Engel, cotrustees of the En-gel Family Trust, Alois Krickl, Marvin and Sylvia Rosett, XBD Claims Management Co., LLC, as successor to XBD, Inc. (formerly known as Brod-Dugan Co.) and the Harold J. Brod Trust (collectively, the investors) move for judgments confirming the August 2001 modified arbitration awards totaling approximately $42 million issued against, among others, respondents Refco, LLC and Constantine Mitsopoulos (collectively, Respondents).[1] Respondents oppose confirmation of the awards and cross-move to vacate them.
Background
Each of the investors retained S. Jay Goldinger as an investment advisor and opened accounts at Capital Insight Broker *93 age, an independent broker dealer company that Goldinger owned. To manage their funds, Goldinger had the investors open several securities accounts. They opened two accounts at Bear Stearns (one for repurchase and reverse repurchase transactions in United States bills and bonds and the other a cash account) and one commodity account for trading futures and options on United States bonds at Refco, a Futures Commission Merchant registered with the Commodity Futures Trading Commission (CFTC) and the National Futures Association (NFA).
The customer agreement between each investor and Refco provided, among other things, that:
• all transactions were subject to the constitution, bylaws, rules, regulations, customs, usages, rulings and interpretations of the exchange, board of trade, contract market or other market (and its clearinghouse, if any) where executed and to all applicable federal and state laws and regulations;
• the agreement and its enforcement “shall be governed by the laws of the State of Illinois”; and
• disputes “shall” be litigated “at the discretion and election of Refco only in a court in Chicago, Illinois.”
Additionally, with the exception of three of the investors’ contracts, the agreements stated that no “action, regardless of form, arising out of transactions under this agreement may be brought by Customer more than one year after the cause of action arose.”
The investors had an arrangement with Goldinger whereby they sent their money to Capital Insight. The funds were then deposited with Bear Stearns. As Goldinger needed money to execute Refco trades, he directed Bear Stearns to wire transfer the appropriate amounts to Refco on behalf of the investors.
To effectuate Refco futures and options transactions, Goldinger would telephone orders to Refco employee Constantine Mitsopoulos and his clerks on the trading floor of the Chicago Board of Trade (CBOT). Mitsopoulos and his clerks would then execute Goldinger’s orders and prepare floor order tickets. After Mitsopoulos and his clerks completed the floor order tickets, the orders were sent to Refco’s computer operators who entered the transactions into CBOT’s system for matching and clearing.
The Fraudulent Scheme
According to the investors (as derived from the Amato petitioners’ amended statement of claim, used as an example, and the modified arbitration awards), beginning in the late *94 1980’s and continuing through the mid-1990’s, Goldinger and the Respondents engaged in a fraudulent scheme, depriving them of millions of dollars. Specifically, Goldinger would call Mitsopoulos (or one of his clerks) with large block orders for futures contracts on treasury securities, consisting of an equal amount of buys and sells. In violation of CBOT rules, Goldinger did not provide Mitsopoulos with account numbers or account designations for the transactions. The orders were then filled. Mitsopoulos or one of his clerks would hold incomplete order tickets, which documented the trades but did not include account information, at Refco’s trading desk, during which time Goldinger could monitor the market.
After Goldinger was able to determine which transactions were profitable and which resulted in losses, he would call Mitsopoulos or one of his clerks on the CBOT floor and assign account numbers to the trades. Then, allegedly in violation of CFTC and CBOT regulations as well as Refco’s own internal policies and procedures, either Mitsopoulos or the clerk would fill in the account numbers on the order tickets and submit them to the CBOT for clearing and entry into Refco’s order system. This after-the-fact gain/loss allocation process enabled Goldinger to move money between customer accounts as he deemed necessary so that he could close or cash out accounts that his clients believed were profitable.
Investors Demand Arbitration
The NFA Arbitration Code authorizes arbitration of disputes between members and their customers. Specifically, section 2 (a) (1) of the code states that except “as provided in Sections 5 and 6 * * * with respect to timeliness requirements,” there “shall” be “mandatory arbitration” of disputes involving commodity futures contracts when a customer seeks arbitration of claims against an NFA member, its employee or an “associate.” Section 5 (“Time Period for Arbitration”), in turn, states that:
“No Demand for Arbitration may be arbitrated under this Code, unless a notice of intent to arbitrate * * * is received by the Secretary within two years from the date when the party filing the Demand for Arbitration knew or should have known of the act or transaction that is the subject of the controversy. * * * The Secretary shall reject any claim that is not timely filed. If, in the course of any arbitration, the Panel determines that the requirements of this section have not been met as to a particular claim, the Panel shall thereupon *95 terminate the arbitration of the claim without decision or award.” (Emphasis added.)
The NFA Arbitration Code further provides that it “shall supersede any provision in an agreement entered into between the parties, either before or after a dispute arises, if the provision in the agreement contradicts or limits the Code.” (NFA Arbitration Code § 17.)
In October 1996, the Blumenfelds — New York residents— filed the first of the 13 investors’ demands for arbitration. Subsequently, the 12 other investors each filed a separate demand for NFA arbitration in connection with the alleged fraudulent scheme. The investors asserted claims against Goldinger, Capital Insight,[2] and the Respondents for violations of the Commodity Exchange Act and its regulations, breach of fiduciary duty, failure to supervise, breach of customer agreement, churning, common-law fraud, conspiracy to defraud, aiding and abetting common-law fraud, deceptive business practices, negligence, gross negligence, negligent misrepresentation and respondeat superior.
In their various statements of claim, the investors alleged that Goldinger was able to perpetrate the fraud undetected because Refco failed to enforce applicable margin requirements. They further averred that Goldinger told them to ignore financial notices that otherwise would have alerted them to the fraud and that confirmations and monthly statements from Refco “were deliberately confusing, false and materially misleading as to the nature of the activity in the accounts.” (See, e.g., Amato statement of claim 16, 20, 21.)
The NFA demand for arbitration form inquired of each investor the date it first knew that a dispute existed, and indicated that it was “not enough to provide a time period or refer to [ ] attachments.” The demand form stated that failure “to properly answer this question will delay the claim.” The investors’ responses revealed that some knew of Goldinger and Capital Insight’s fraud as early as November 1995, and learned of Refco and Mitsopoulos’ participation in March 1996 and February 1997, respectively.
On March 13, 1997, the Blumenfelds and Refco executed a stipulation (the 1997 stipulation), agreeing that the Blumenfeld arbitration was to be submitted to a NFA arbitration panel *96 in New York City and “that neither party shall initiate any judicial proceeding to stay such arbitration or otherwise present any claim or defense to a judicial forum for a resolution prior to an award in the arbitration; provided that, nothing herein shall be construed to impede either party from resorting to judicial process if necessary to compel the attendance of witnesses for testimony.” (See, Mar. 13, 1997 stipulation, affirmation in support of petitions to confirm arbitral awards, exhibit B.)
Subsequently, in response to the investors’ and the Respondents’ request, the NFA agreed to consolidate the remaining 12 arbitration proceedings with the Blumenfeld arbitration. To address “time commitment concerns” resulting from consolidation of the matters, NFA suggested that the arbitration panelists receive between $750 and $1,000 per hearing session instead of the standard honorarium of $225 per day with an additional $50 daily for the chairperson. (See, Sept. 11, 1997 NFA letter to counsel, affirmation in support of petitions to confirm, exhibit C.)
Arbitration Proceedings
The NFA arbitration panel heard evidence and argument between July 1998 and April 2001; thus, the complex consolidated arbitration spanned almost three years.[3] There were over 24,000 pages of hearing transcripts, 59 witnesses, more than 400 exhibits, over 700 pages of posthearing memoranda and numerous other submissions (all of which presumably were included in the 17 boxes of materials the parties submitted along with these petitions).[4] (See, modified award at 1; see also petitioners’ memorandum of law in further support at 7.)
Throughout the arbitration, many issues — procedural and substantive — were sharply contested, argued and submitted to the panel for determination. Significantly, during the course of the arbitration, Refco vehemently urged that the investors “had failed to make timely demands for arbitration, and therefore, the arbitration panel lacked jurisdiction to adjudicate their claims.” (Affidavit of Ryan P. Farley, dated Sept. 28, 2001, 117.)
Additionally, the parties vigorously litigated whether one of the petitioners, XBD, Inc., had standing to arbitrate claims. *97 Respondents contended that Brod-Dugan Co., XBD’s predecessor, sold its business to the Sherwin-Williams Company.[5] The asset-purchase agreement between Brod-Dugan and SherwinWilliams contemplated a transfer of all assets except for “all cash or cash equivalents * * * and all other passive investments of cash whether held directly by the seller or by a money manager on seller’s behalf, together with all rights thereto.” (See, Refco’s appendices in support to motions to vacate, vol VI, exhibit MX28, at 2.) Based on that language, Respondents argued that any rights to the claims were assets that were transferred to Sherwin-Williams, and therefore, XBD had no right to the claims as Brod-Dugan’s successor. XBD countered that the claims related to “cash management funds” and were not transferred as part of the asset purchase agreement. The president of Brod-Dugan, who signed the asset purchase agreement, testified that the company retained the right to sue for the losses at Capital Insight.
Arbitration Award
In August 2001, the arbitrators issued modified arbitration awards.[6] Each award summarized the main arguments that were submitted to the panel. With respect to the timeliness arguments, the awards stated:
“Respondents maintain that the individuals responsible for the investment decisions in Claimants’ accounts were sophisticated business persons, advised by accountants, attorneys and others, who should have been on notice by numerous reports, information and other events that their funds were not being invested as Goldinger had promised. Respondents argue that Claimants had a duty of further inquiry that triggered the two-year provision of Section 5 of the NFA Code of Arbitration, which bars in whole or part [of] Claimants’ claims. Further, Refco argues that a one-year limitation in its customer agreement bars all claims against Refco.
“Claimants maintain that the documents they received, including Refco documents, which reported losses in their accounts, triggered no obligation of further inquiry because their accounts at Refco were hedge accounts and losses on Refco’s side of the hedge could be expected. Any customer responsibility, Claimants argue, is overcome by the scope of the fraud.” (Modified arbitration awards at 2.)
*98 In the XBD award, the arbitrators further stated that “Respondents allege that the claims of XBD, Inc. should be dismissed for lack of standing.” (XBD modified arbitration award at 2.)
In issuing awards to each of the investors, the arbitrators rejected Respondents’ untimeliness and lack of standing arguments. The arbitrators further determined: “Having carefully considered the extensive record, the numerous legal and factual arguments, and all other matters in these proceedings, the Panel finds that all Respondents have violated the anti-fraud provisions of the Commodity Exchange Act and Regulations Thereunder.” (Modified arbitration awards at 3.)
The award also provided that to the extent relief was not awarded, it was denied. (See, modified award at 3.)
The Aftermath: This Proceeding
The NFA faxed the modified awards to the parties on August 21, 2001. It faxed the awards to Refco first — between 11:11 and 11:42 a.m. By 12:40 p.m. that same day (less than an hour later), Refco filed a motion to vacate the awards in the United States District Court for the Northern District of Illinois. After the investors received faxes of the modified awards, they immediately — also on that very day — commenced these proceedings (in Supreme Court, New York County) to confirm the awards. In November 2001, the Illinois District Court dismissed all “cases pending before [the] court * * * in their entirety without prejudice for improper venue.”[7] (See, Eppenstein affirmation in further support of petition to confirm, exhibit A.)
Pending before this court are the investors’ motions to confirm the modified awards as well as Refco and Mitsopoulos’ cross motions to vacate them. The investors argue that both under New York State and federal law the arbitrators’ rational determinations, including their conclusions as to arbitrability, are entitled to great deference and must be confirmed.
In opposition, Refco argues that under governing federal law arbitrability issues, including standing and timeliness, are to be reviewed de novo and that the arbitrators came to the wrong conclusions on those issues here. Refco argues that the arbitrators exceeded their power and manifestly disregarded the law.
Mitsopoulos for the most part joins in Refco’s arguments, and further posits that based on the investors’ customer agreements with Refco (for example, the discretionary account agree *99 ment), which state that “Refco shall have no liability for following the instructions of the Advisor [here, Goldinger],” the arbitrators manifestly disregarded the law in imposing liability. Mitsopoulos also maintains that the arbitrators committed misconduct by demanding additional compensation and refusing to allow him to present his case completely.
Because the evidence conclusively establishes that the parties explicitly and unambiguously agreed to submit issues of arbitrability to the arbitrators, and because Respondents have failed to establish any basis for vacating the modified arbitration awards, which are entitled to substantial deference, the petitions are granted and the cross motions to vacate are denied.
Analysis
Arbitration of Arbitrability
Central to resolution of this dispute is the analysis of whether the arbitrators had the power to decide arbitrability — in this case, ascertain whether the investors timely asserted their claims and whether XBD had standing — and if so, what standard of review applies to their determination. Fortunately, the law is well settled.[8]
In First Options of Chicago, Inc. v Kaplan (514 US 938, 943 [1995]), the United States Supreme Court concluded that:
“Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question ‘who has the primary power to decide arbitrability turns upon what the parties agreed about that matter. Did the parties agree to submit the arbitrability question itself to arbitration? If so, then the court’s standard for reviewing the arbitrator’s decision about that matter should not differ from the standard courts apply when they review any other matter that parties have agreed to arbitrate. That is to say, the court should give considerable leeway to the arbitrator, setting aside his or her decision only in certain narrow circumstances. If on the other hand, the par *100 ties did not agree to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration, namely, independently” (citations omitted).
The Supreme Court further outlined the process for determining whether parties agreed to arbitrate arbitrability, explaining that subject to an “important qualification” ordinary state law contract principles govern. (Id. at 944.) The “important qualification” is that courts “should not assume that the parties agreed to arbitrate arbitrability unless there is ‘clea[r] and unmistakabl[e] evidence that they did so.’ ” (Id. [citations omitted].) Interestingly, with respect to arbitration of arbitrability, the usual presumption — that doubts concerning the scope of arbitrable issues be resolved in favor of arbitration — is reversed. Because the question of “who (primarily) should decide arbitrability” is “arcane” — parties might not focus on the significance of having arbitrators decide their own powers — there must be clear evidence of the parties’ intent to submit the matter to arbitrators.
The evidence herein conclusively establishes, and there can be no question, that the parties agreed to submit disputes about timeliness and standing to the arbitrators. This conclusion is compelled by a confluence of multiple considerations including the parties’ 1997 stipulation, the NFA Arbitration Code and most importantly, the parties’ conduct.
Parties can agree to arbitrate arbitrability through conduct by voluntarily submitting the issue to arbitrators, vigorously debating it before them, and then completely failing during the proceedings to challenge their authority to decide the issue or otherwise preserving it for judicial resolution. (See, Rock-Tenn Co. v United Paperworkers Intl. Union, AFL-CIO, 184 F3d 330, 334 [4th Cir 1999]; Lucile Packard Children’s Hosp. & Stanford Hosp. Clinics v U.S. Nursing Corp., 2002 WL 1162390, *3-4, 2002 US Dist LEXIS 10019, *7-8 [ND Cal 2002] [party clearly agreed to submit, and did submit, the issue of arbitrability to the arbitrator]; see also, Carpenters 46 N. Cal. Counties Conference Bd. v Zcon Bldrs., 96 F3d 410 [9th Cir 1996] [acknowledging that parties can agree to arbitrate arbitrability through conduct but holding, based on the record, that conduct did not establish such an agreement under the circumstances]; Coast Hotels & Casinos v Culinary Workers Union Local 226, 35 F Supp 2d 765, 768-769 [D Nev 1999].)
*101 Indeed, New York law has long recognized that an agreement can be based on the parties’ conduct. (See, e.g., Brown Bros. Elec. Contrs. v Beam Constr. Corp., 41 NY2d 397, 399 [1977] [“In determining whether the parties entered into a contractual agreement and what were its terms, it is necessary to look * * * to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds” (emphasis added)].)
Here the parties’ conduct — considered in tandem with the NFA rules and the March 1997 stipulation — unambiguously indicates that they agreed that the arbitration panel could, and indeed should, decide the timeliness and standing issues. Respondents voluntarily submitted extensive arguments to the arbitrators on these issues, never once objecting to, or even questioning, their ability or authority to decide them. Submission of the timeliness and standing issues to the panel for resolution without objection or, for that matter, without any indication that Respondents did not believe the panel was empowered to decide them, indicated not only that Respondents believed the arbitrators had the authority to decide those disputes, but that Respondents wanted them to decide those disputes. Allowing Respondents to fully submit the timeliness and standing issues to the arbitration panel, await the panel’s result and then — unhappy and dissatisfied with the outcome— for the first time assert that the arbitrators never had the power to render decisions on the matters in the first instance would work a serious miscarriage of justice. (See, Carpenters 46 N. Cal. Counties Conference Bd. v Zcon Bldrs., supra, 96 F3d at 415.) All of the parties expended significant time (literally years), effort and money arbitrating their claims, including vigorous argument of both timeliness and standing. Under these circumstances, once they sought a panel decision regarding timeliness and standing, they agreed to be bound by that decision subject to a deferential standard of judicial review.
The 1997 stipulation and NFA Arbitration Code buttress this result. The 1997 stipulation between Refco and the Blumenfelds states “that neither party shall initiate any judicial proceeding to stay such arbitration or otherwise present any claim or defense to a judicial forum for a resolution prior to an award in the arbitration; provided that, nothing herein shall be construed to impede either party from resorting to judicial process if necessary to compel the attendance of witnesses for testimony.” (See, Mar. 13, 1997 stipulation, affirmation in support of petitions to confirm arbitral awards, exhibit B.) The *102 only reasonable interpretation of this agreement (particularly in the context of the parties’ conduct and the NFA Arbitration Code) is that the parties understood that threshold arbitrability issues would be submitted to the arbitrators subject to a deferential standard of judicial review after rendition of an award. It strains credulity to assume that by entering into this stipulation both parties agreed to submit everything to the arbitration panel — including exhaustive argument of jurisdictional issues (see, e.g., affidavit of Ryan P. Farley, dated Sept. 28, 2001, 7), extensive argument on the merits, testimony from 59 witnesses (covering thousands of pages of transcripts), presentation of hundreds of exhibits for consideration and submission of over 700 pages of postargument submissions— only to then be able to attack the arbitral determination and obtain de novo judicial review. In fact, there would be no point at all to arbitration and no advantage to any of the litigants (not to mention a significant disadvantage to the NFA, as its decision making power would be significantly curtailed) if such an interpretation, allowing any party to seek relitigation of important threshold issues anew after obtaining unfavorable results on the merits, were afforded to the 1997 stipulation. Potentially, almost three years of the parties’ and the arbitrators’ time, effort and energy could be rendered completely ineffectual. All of the parties’ conduct considered against the backdrop of the 1997 stipulation, which by its terms bound Refco in at the very least the Blumenfeld matter — the proceeding with which all of the investors’ arbitrations were joined— compels the conclusion that the parties agreed to arbitrate arbitrability.
The NFA Arbitration Code further supports this result. At the outset, the code broadly authorizes arbitration of disputes involving commodity futures contracts at the customer’s election (see, NFA Arbitration Code § 2), thereby evidencing a policy of liberally allowing the customer to select the arbitral forum for dispute resolution. True, the code forbids arbitration of a dispute where a claimant fails to file a demand “within two years from the date when the party * * * knew or should have known of the act or transaction that is the subject of the controversy.” (NFA Arbitration Code § 5.) It does not, however, preclude the arbitrators from resolving “disputes” as to when it was that the claimant “knew or should have known” of the controversial act or transaction.
Indeed, the arbitration code explicitly contemplates that panelists may very well make such a determination. (See, NFA *103 Arbitration Code § 5 [“If, in the course of any arbitration, the Panel determines that the requirements of this section have not been met as to a particular claim, the Panel shall thereupon terminate the arbitration of the claim without decision or award” (emphasis added)].) These expansive code provisions, especially when read in conjunction with the parties’ conduct, further evidence clear intention to submit arbitrability issues to the arbitrators. (Compare, Painewebber Inc. v Bybyk, 81 F3d 1193, 1198 [2d Cir 1996] [construing NASD agreement against member, and holding agreement sufficiently evidenced parties’ intent to arbitrate arbitrability].)[9]
Refco’s reliance on First Options and Jones & Co. v Sorrells (957 F2d 509, 514 [7th Cir 1992]), to support its argument that participation in the arbitration and actual submission of the arbitrability issue to the arbitrators for a decision without objection should be deemed irrelevant, is misguided and misplaced. In First Options, the objectants argued that because they altogether never signed an agreement to arbitrate, there were no circumstances at all under which any disputes were arbitrable. They maintained that there was no possible way an arbitrator could ever assume jurisdiction over them.
Here, by contrast, the parties agreed that an arbitration agreement governed and, assuming certain conditions were met, arbitration was perfectly warranted. At issue in this case was simply interpretation and analysis of these conditions, namely, (1) did the investors know or should they have known of the allegedly fraudulent acts more than two years before filing a demand for arbitration, and (2) did XBD retain the right to seek damages for the alleged fraud after the Brod-DuganZ Sherwin-Williams merger. There is no indication in the record that Respondents did not believe the arbitrators were empowered to interpret these conditions. To the contrary, based on the NFA rules, the March 1997 stipulation and the parties’ vigorous arguments before the arbitration panel, the evidence undisputably establishes that Respondents contemplated that the arbitrators would decide the issues. In stark contrast to First Options — where the parties objecting to arbitration “forcefully” argued that there was no jurisdiction to arbitrate based on the utter lack of an agreement and the record was devoid of evidence that they “clearly agreed to have the arbitrators *104 decide the questions of arbitrability” — here, the evidence clearly establishes the parties’ agreement to arbitral resolution of arbitrability.
Likewise, Jones & Co. (supra, 957 F2d at 514), a case that predates First Options, is readily distinguishable. In Jones & Co., the objectants claimed from the beginning that the NASD did not have jurisdiction to arbitrate some claims based on section 15 of the NASD Code, which provided that “[n]o dispute, claim, or controversy shall be eligible for submission to arbitration under this Code where six (6) years have elapsed from the occurrence or event giving rise to the act or dispute, claim or controversy” (emphasis added). Based on settled Seventh Circuit precedent and the particular language and history of the NASD Code provision, the court concluded that section 15 was an “eligibility requirement,” not a statute of limitations, and that the NASD absolutely did not have the power or authority to consider claims that arose from transactions that were over six years old. The Seventh Circuit further concluded that there was no “evidence in the record demonstrating that the parties intended to allow the arbitrators to define their own jurisdiction” and that it was for the court to decide arbitrability notwithstanding the parties’ submission of arguments on the issue to the panel. (Id. at 514; contrast, Matter of Smith Barney Shearson v Sacharow, supra, 91 NY2d at 46-47 [based on NASD Code arbitrators could decide arbitrability].)
Here, by contrast, there has never been a determination that NFA Arbitration Code § 5 is an “eligibility requirement.” In fact, the code explicitly contemplates a scenario where arbitrators themselves determine the timeliness of a claim.[10]
Based on the parties’ unambiguous agreement to arbitrate arbitrability, manifested by their conduct, by the 1997 stipulation, and by the NFA Arbitration Code, this court will apply the general, extremely deferential standard of review to the entirety of the arbitral awards. (See, First Options of Chicago v Kaplan, supra, 514 US at 943; Bull HN Information Sys., Inc. v Hutson, 229 F3d 321, 330-332 [1st Cir 2000].)
Review of Arbitration Award
A court may vacate an arbitration award on statutory grounds — as relevant here, where the arbitrators have “ex *105 ceeded their powers” or committed misconduct — or, where the arbitrators have acted in “manifest disregard” of the law. (See, Willemijn Houdstermaatschappij, BV v Standard Microsystems Corp., 103 F3d 9, 12 [2d Cir 1997]; see also, 9 USC § 10 [a] [3], [4].) However, to avoid summary confirmation of an arbitration award, the party moving to vacate must overcome a heavy burden. (Willemijn Houdstermaatschappij, BV v Standard Microsystems Corp., supra, 103 F3d at 12.) In furtherance of the twin goals of arbitration — settling disputes efficiently and avoiding long, expensive litigation — and to ensure that arbitration never becomes merely “a preliminary step to judicial resolution,” review of an arbitral judgment is extremely deferential. (Eljer Mfg., Inc. v Kowin Dev. Corp., 14 F3d 1250, 1254 [7th Cir 1994], cert denied 512 US 1205 [1994]; see also, Willemijn Houdstermaatschappij, supra.) The standard of review is “among the narrowest known to law.” (Brown v Coleman Co., Inc., 220 F3d 1180, 1182 [10th Cir 2000], cert denied 531 US 1192 [2001]; see also, Eljer Mfg., supra; Willemijn Houdstermaatschappij, supra.)
Refco argues that the arbitrators exceeded their authority and manifestly disregarded the law by issuing decisions in untimely proceedings and rendering an award in favor of XBD, a claimant that allegedly did not have standing. Mitsopoulos additionally urges that the arbitration panel manifestly disregarded the law in failing to enforce the parties’ contractual agreements, wherein the investors, among other things, agreed to hold Refco harmless for the acts of their investment advisor, Goldinger. Mitsopoulos further contends that by demanding additional compensation as late as August 1998 and by refusing to allow him to present his case completely, the arbitrators committed misconduct.
Excess of Authority and Manifest Disregard of the Law
In determining whether an arbitration panel exceeded its authority, courts do not review claims of factual or legal error as an appellate court would a trial court decision. Even where an error is “painfully clear” courts may not reconsider the merits of an arbitration award. (See, e.g., Bull HN Information Sys. v Hutson, supra, 229 F3d at 330-332 [deferring to arbitral determination that claim was timely].) Similarly, the “manifest disregard” of law test requires something beyond “mere error.” (See, Willemijn Houdstermaatschappij, BV v Standard Microsystems Corp., supra, 103 F3d at 12.) Not only must parties seeking to vacate arbitral awards show that the arbitrators knew of and altogether disregarded governing law, they must *106 also establish that the law allegedly ignored “was well defined, explicit, and clearly applicable to the case.” (See, Greenberg v Bear, Stearns & Co., 220 F3d 22, 28 [2d Cir 2000], cert denied 531 US 1075 [2001] [refusing to vacate arbitral award concluding that Bear Stearns did not know of a broker’s fraud, and refusing to hold that Bear Stearns should have been deemed knowledgeable because it had the necessary information before it].) Moreover, where, as here, arbitrators have not articulated an explanation for their award, courts must nonetheless confirm their determination if a ground for the decision can be inferred from the facts; and, provided that there is “ ‘even a barely colorable justification for the outcome reached,’ ” it will be upheld. (See, Willemijn Houdstermaatschappij, BV v Standard Microsystems Corp., supra, 103 F3d at 13 [citation omitted].)
Under this narrowly circumspect standard of review, the timeliness and standing determinations must be confirmed. In light of this court’s conclusion that the arbitrators clearly had the authority to consider and decide arbitrability, Respondents’ arguments in support of vacatur amount to nothing more than analysis of whether the decisions were made in “manifest disregard of the law.” (See, DiRussa v Dean Witter Reynolds, Inc., 121 F3d 818, 824 [2d Cir 1997], cert denied 522 US 1049 [1998].)
Respondents argue at length that each of the investors knew or had reason to know of the fraudulent scheme more than two years before filing their respective arbitration demands, and that the investors, allegedly subject to a one-year limitation period brought their claims more than one year after they arose. Citing case law and the NFA Arbitration Code, which states that it supersedes any provision in an agreement that limits the code, the investors maintain that the arbitrators properly disregarded the one-year contractual limitation period contained in some of the customer agreements. Additionally, the investors assert that based on the nature of the fraud,- all of them filed timely demands for arbitration within two years of when they knew or should have known of the scheme.
From the face of the award, which outlines the parties’ timeliness contentions, it is clear that the arbitrators were cognizant of all of the applicable legal arguments. In addition, Respondents have utterly failed to establish that well-defined, clearly applicable law precludes the result that the panel reached or that there was “no colorable justification” for the arbitrators’ determinations. The panel could very well have *107 concluded either that the customer agreements’ one-year limitation period should not limit the NFA Arbitration Code’s two-year period or that the one-year period could not lawfully be enforced. The arbitrators further could very well have credited the investors’ testimony that they did not know of the fraud more than two years before filing their demands and, based on the evidence — including Goldinger’s alleged advice to the investors (purportedly encouraging them not to inquire further into the Refco transactions) as well as the allegedly confusing financial documents — the panel could reasonably have determined that the demands for arbitration were timely. Respondents have failed to demonstrate that it is patently clear that the arbitral decision was wrong, that it necessarily contravened well-settled law, and even more significantly, that there is absolutely no colorable basis to justify it. (See, Willemijn Houdstermaatschappij, BV v Standard Microsystems Corp., supra, 103 F3d at 13.)
Similarly, Respondents have failed to establish that the arbitrators “manifestly disregarded the law” in concluding that XBD had standing. The arbitrators undeniably took notice of Respondents’ lack-of-standing argument that based on the Brod-Dugan/Sherwin-Williams asset purchase agreement, Brod-Dugan transferred any and all of its rights to the claims in this case to Sherwin-Williams. The panel, however, obviously rejected the restrictive interpretation that Respondents— nonparties to the asset purchase agreement — espoused. Affording a broad interpretation to the asset-purchase agreement provision at issue, the arbitrators could very well have determined, based on the evidence, that the claims in question involved “passive investments of cash” or rights thereto and were not transferred. Again, Respondents have failed to show that the contract “clearly” compelled their interpretation of the asset purchase agreement and that no other interpretation was even “colorable.” (See, Willemijn Houdstermaatschappij, BV v Standard Microsystems Corp., supra, 103 F3d at 13.)
Likewise, Mitsopoulos has failed to establish that the panel “manifestly disregarded the law” in imposing a judgment against him notwithstanding contractual provisions purporting to absolve Refco of liability based on Goldinger’s conduct or for “following the instructions of [Goldinger].” First, it is not clear that the provisions éven extend to Mitsopoulos. Second, it is not clear that they absolve Refco or Mitsopoulos from liability based on their own independent fraudulent conduct, failure to follow the law, or noncompliance with Refco’s own rules. *108 Mitsopoulos’ argument amounts to nothing more than a weak, unsupported and belated effort to escape liability, which will not be countenanced in reviewing the arbitrators’ determinations.
Arbitrator Misconduct
Finally, Mitsopoulos argues that the arbitration awards must be vacated based on the arbitrators’ alleged misconduct. He contends that the arbitrators improperly asked for additional compensation while rulings affecting his case were pending and that he objected to the fee increase. Under the circumstances, the arbitrators’ requests for additional compensation did not raise an appearance of impropriety. (Contrast, Matter of Catalyst Waste-to-Energy Corp. of Long Beach [City of Long Beach], 164 AD2d 817, 820 [1st Dept 1990], appeal dismissed 76 NY2d 1017 [1990].) The record before this court reflects that Mitsopoulos, like the investors and Refco, agreed to the compensation increase, which was justified by consolidation of all of the arbitration proceedings. The arbitrators, through the NFA, sought more money so that they could accomplish more— more quickly and more efficiently — by consolidation of the investors’ arbitrations. In fact, through consolidation of the proceedings, the parties, including Mitsopoulos, in all likelihood paid less than they would have had each matter been individually arbitrated. (See, United House of Prayer For All People v L.M.A. Intl., Ltd., 107 F Supp 2d 227, 233 [SD NY 2000].) Some of Mitsopoulos’ after-the-fact objections to the arbitrators’ fees, moreover, simply related to an arbitrator’s performance. (See, affidavit of Walter C. Greenough in support of Mitsopoulos’ motion to vacate arbitration award, exhibit N [June 24, 1998 letter from Counsel to Scott V. Reeves (NFA supervisor, arbitration) stating (“My client will not agree to pay any portion of [one of the arbitrators] $400 an hour charge for that kind of performance”)].) Mitsopoulos simply has not met his burden of establishing misconduct, or, for that matter, any impropriety at all.
Acknowledging that arbitrators are vested with broad discretion to make evidentiary rulings, Mitsopoulos lastly urges that the panel committed misconduct by failing to afford him with an opportunity to present his case completely, in violation of the law and NFA rules. Mitsopoulos’ arguments are again without merit.
Arbitrators have broad discretion to decide what evidence should be presented. (See, e.g., GFI Sec. v Labandeira, 2002 WL 460059, *6, 2002 US Dist LEXIS 4932, *10 [SD NY 2002].) To warrant vacatur of an arbitration award, a ruling must be *109 egregious and deny a party fundamental fairness. (Id.; see also, Flender Corp. v Techna-Quip Co., 953 F2d 273, 280-281 [7th Cir 1992] [every failure to admit relevant evidence does not constitute misconduct warranting vacatur].) The NFA Arbitration Code, moreover, establishes that arbitrators have wide latitude in establishing procedural rules and making evidentiary rulings. Section 9 (d) (3) and (10) provide, among other things, that the panel “need not apply the technical rules of evidence” and that “the hearing procedure shall be determined by the Panel,” which “shall afford the parties every reasonable opportunity to present their case completely.” (Emphasis added.)
Mitsopoulos first alleges that the arbitrators erred in refusing to admit into evidence a transcript from 1988 deposition testimony that Goldinger provided before the Commodity Futures Trading Commission. The panel’s decision denying admission of the 1988 deposition testimony, which did not particularly relate to any of the investors’ claims, cannot be deemed unreasonable. Nor did the determination rise to the level of an abuse of discretion or constitute a denial of “fundamental fairness.” (See, GFI Sec. v Labandeira, supra, 2002 WL 460059, *6, 2002 US Dist LEXIS 4932, *10.)
Next, Mitsopoulos argues that the panel denied him an opportunity to completely present his case by only begrudgingly ruling in his favor that the investors had opened the door to certain testimony after earlier stating they wanted to hear nothing more on the issue. The panel’s decision to reverse itself and allow Mitsopoulos’ attorney to pursue a line of questioning it had earlier disallowed cannot be deemed unreasonable or to have denied him “fundamental fairness.” (Id.) Indeed, the ruling was in Mitsopoulos’ favor. The fact that Mitsopoulos’ counsel subjectively may have felt chilled from availing himself of the opportunity to conduct further examination does not change the reality that he was given a full and fair opportunity to elicit evidence and failed to do so.
Accordingly, it is ordered that the petitions are granted and the awards rendered in favor of the petitioners and against the respondents are confirmed; and it is further ordered that the cross motions to vacate the arbitration awards are denied.

. Refco, LLC has assigned the liabilities associated with the arbitration awards to Refco Group Ltd., LLC. The other respondents who have not appeared in this proceeding are S. Jay Goldinger and Capital Insight Brokerage. Pursuant to a stipulation of partial voluntary discontinuance, the Engel and Dieckhaus petitioners have discontinued as against Refco and Mitsopoulos. (See, May 23, 2002 letter from the investors’ counsel to the court.)

. The Blumenfeld claimants did not assert claims against Goldinger and Capital Insight since they had previously obtained a default judgment against them in California.

. Goldinger and Capital Insight answered the demands for arbitration but never appeared at any of the hearing sessions.

. In light of the extremely deferential standard of review that is applicable (see, infra at 105-106), the court had no occasion to examine the boxes of materials containing the record of the proceedings. Thus, the boxes will be returned to the parties unopened.

. After the 1996 sale of substantially all of its assets to Sherwin-Williams Company, Brod-Dugan Co. changed its name to XBD.

. The arbitrators initially issued awards on June 30, 2001.

. Refco dismissed the Rosett action “because of concerns that diversity jurisdiction might not exist.” (Farley affidavit, dated Sept. 28, 2001, j[ 17.)

. Because this proceeding arises out of a written agreement to arbitrate “a contract evidencing a transaction involving commerce,” this court will apply federal law. (See, Federal Arbitration Act [9 USC] § 2; Singer v Jefferies & Co., 78 NY2d 76, 82 [1991].) Significantly New York law would not compel a different result. (See, e.g., Matter of Smith Barney Shearson v Sacharow, 91 NY2d 39 [1997].)

. The Second Circuit has recently held that the NASD Code alone— without anything more — will not support a finding that an investor and member agreed to arbitrate arbitrability. (See, John Hancock Life Ins. Co. v Wilson, 254 F3d 48, 55 [2d Cir 2001].)

. Similarly, Scott v Prudential Sec., Inc. (141 F3d 1007 [11th Cir 1998], cert denied 525 US 1068 [1999]), which dealt with the NFA Arbitration Code, is inapposite. There, the objectant tried to avoid arbitral determination of arbitrability by seeking a temporary restraining order to enjoin the NFA proceedings.